With this remote, we don't want to have anybody missing out because it's not as easy to communicate. Please proceed. Thank you, your honors. Your honors, the question in this case is not which is the best system for allocating organs. That is, of course, a policy question for defendants to make. The legal questions for this court are much narrower. First, did defendants follow the proper procedures for vetting their new kidney policy? And second, was their policymaking process tainted by a faulty legal premise and by skewed data? I'd like to start, if I could, with the first procedural defect, which we think is actually pretty straightforward on appeal. So, everyone agrees that the heightened procedures set forth by section 121.4b2 kick in if the secretary directs the OPTN to provide him with a proposed policy for review. And HHS concedes on appeal, page 7 of their brief, that under section 121.8, the OPTN is required to provide all proposed organ allocation policies to him for secretarial review. That concession, which contradicts the crux of the reasoning of the district court below, is dispositive. Well, counsel, you tell us how narrow these issues are, but I believe you're appealing the denial of a preliminary injunction. And I believe a major reason for the district court's articulation of the denial was your client's unreasonable delay with plenty of notice of what was going on. Delay in asserting this to the point where we are now, an injunction now would do great damage. So, that's not a narrow legal procedural question. That's the essence of our data phase inquiry. Well, as your honor knows, there are multiple factors that go into the preliminary injunction analysis. The one I had started with was the likelihood of success on the merits, which the court has often said is the most important factor. No, no, we haven't. The Supreme Court has said irreparable injury is the immutable starting point. Irreparable injury is also critical, your honor. No question about it. Justice Black said about 80 years ago, if there's not an irreparable injury, you don't get a preliminary injunction. There's no question, your honor, and I absolutely agree with that. Irreparable injury is necessary. I don't actually think there's dispute on appeal that the hospitals are threatened by irreparable injury, in the sense that the new policy is going to cause them to perform far fewer transplants than the prior policy would have. That harms both the hospitals and their patients in an irreparable way. Now, the district court, you're correct, your honor, said that the delay in bringing the suit cut against the showing of irreparable harm. Respectfully, we think that's not correct in this case, because the lawsuit was filed in advance of the implementation of the new policy. And I think it's... How far in advance? Well, it was originally about two... How many days or weeks in advance? Your honor, it was originally filed about two weeks in advance. The defendants then voluntarily stayed. It was about three months, ultimately, in total before the policy took effect. But I think, your honor, it's impossible to ignore what was going on at the time in the world that really impacted this. I mean, just to be candid, these are hospitals, and we're talking about a period of time when they were dealing with the most severe public health crisis in a century. And that both consumed their attention and caused them to believe that this policy would not actually be taking effect until at least after the crisis had passed. Now, they were wrong about that. And the UNOS ultimately announced in October of 2020, no, we're going ahead, gave the firm implementation date. At that point, notwithstanding that we were still in the height of the pandemic, the suit was filed within a number of weeks. And, your honor, I don't think that was... I think that the complaints about the filing time are really overstated in light of that. I also think, legally, the district court put too much emphasis on it because the cases that the district court relied on, which involved situations where the plaintiff is suffering the harm and doesn't take prompt action, don't really extend to a situation where, once there was a firm implementation date and this suit became ripe, it was quite quick that the hospital sprung into action and got this case on file. And then, again, with respect to sort of the free-floating equitable aspect of it, I would just say there really hasn't been any prejudice shown to the defendants. We're really in the same position now that I think, your honor, we would have been in had this case been filed in September or October or November of 2020, which is the district court denied relief. Counsel, my reference was to the impact of issuing the injunction now, sometime after the new policy is in effect. I'm not talking about... You haven't addressed that. No, no, no, you're right. I apologize, your honor. Yes, they do argue on appeal that even if the district court was wrong to deny relief in advance of the policy taking effect, now things have changed and that somehow factors into the calculation for this court. And respectfully, I don't think that's correct. The question for this court is did the district court err in denying relief before the policy took effect? Well, aren't we supposed to consider the harm to the public? And aren't we at this point, if we're looking at this injunction, having to balance the harms? There's harms to your client, there's harms to the public generally. The status quo is what it is right now, today, at this moment. And an argument can be advanced that changing does impose a risk to the public. I mean, because these are not static questions. I mean, organs are being transplanted every single day. And so how would you balance those harms? And I'm sure you're going to tell me that they balance in favor of your clients. If so, how and why? Well, actually, Your Honor, what I would say is, and I understand the question about the change in circumstances since the injunction was denied below. But my response to that would be we don't have any record on that. Because, of course, the district court denied relief before the policy took effect. So we now have a brief on appeal from defendants saying, well, now everything's changed, you can't possibly issue an injunction now. We have no idea if that's true, Your Honor. And if that is really what should be driving this, then we should have the opportunity, both parties need to have the opportunity, to put in evidence about what's happened since March. You know, none of that has happened. I don't think none of that can happen on appeal. And so what I would suggest... Counsel, was there evidence, though, about the preparation that was put into shifting the policy? Does that play into it? And I think that was before the district court, was it not? Sure, Your Honor. There was definitely some preparation for the change. Of course, that's always going to be true, I think, when you have a policy change. And I don't think that really bears on the question of preliminary relief versus final relief, right? I mean, yes, there are steps taken. They were taken mostly in November and December of 2020. But, you know, if the policy is unlawful, if the court agrees with our position that plaintiffs are likely to prevail on the merits, then I don't think that cuts against a preliminary injunction now. Because it's not going to be any better down the road. And so, respectfully, Your Honor, I think, although these are, you know, irreparable harm must be shown and the equities, of course, are important in considering... One more question on harm. How do we compare the adverse impact on people who don't get transplants in your client's hospital with the positive impact of the people elsewhere who do get this limited treatment? Right. Yeah, I understand that. What I would say to that, Your Honor, is I think sort of the best case for defendants or the best argument for defendants is that, well, this sort of washes out. But if it washes out in the sense that, you know, some people are going to gain and some people are going to lose... I think it establishes for me that this is all about money. Well, it's not about people getting organs or not getting organs. Well, let me say a couple of things about that, Your Honor. First point is our position, and we think it's well established in the record, is that fewer people are going to get organs under the new policy than under the old policy. And potentially substantially more. Nationwide? Nationwide. On an aggregate basis, the number of transplants, successful transplants, is projected to go down. And I think it would be projected to go down even more had... This is the balance where it's plus 1,500 and minus 1,400 that you're talking about. Because the combined transplant procedures will increase. Am I right? That's what you're talking about? So the projection is, and this is accepting the defendant's model, which of course we challenge. We say that they've dropped one of the most important factors from the model. And so it's not a reliable model. But even under their model, the total number of transplants that are projected to occur is going to be lower under the new policy than under the old policy. But, Your Honor, I don't think the court needs to really get there. What I was going to say was, even if you think that, look, there are harms on both sides, to me what that reinforces is that the decision should really be driven by the merits. If the policy is illegal, the policy should be enjoined. If the policy is lawful, then the policy should not be enjoined. Because, yes, there are going to be winners and losers on both sides, regardless of how the court comes out on the injunction. So, again, to me that pushes us really back to the merits analysis. And so, you know, where I started was on the merits, I don't think defendants have a credible response to our procedural challenge. In that they've now conceded the OPTN has to give these policies to the secretary in advance for review. And under Section 121.4b2, plain terms, that means that if the policy is significant, it has to be referred to the advisory committee, so that the secretary has the benefit of independent medical advice expertise that's not just coming from this one source, you know. And there's no dispute that the secretary didn't take up those procedures in this case. Now, the main response on appeal from HHS seems to be, well, we never really use those procedures. We've never used them and we don't have to use them. To me, that supports our position. That HHS's interpretation of the regulation creates the appearance of review, creates the appearance of consultation with independent experts, which is what HHS touted when it promulgated this rule in the first place. But it's all a Potemkin village, because apparently they never have to use it, they never do use it, they never have used it, and they're never planning to use it. Respectfully, Your Honor, I don't think that can be a correct reading of the regulation. Meanwhile, of course, our interpretation makes perfect sense. These organ allocation policies are the most important, most consequential thing that the OPTN does. And it's not a surprise then that Section 121.8 requires the OPTN to provide those proposals to the secretary for review as HHS concedes on appeal. Counsel, I have a question about your assertion there. You're talking about 121.8 subsection F? Yeah, well, Your Honor, it's really D, E, and F, I think, have to be read together. But the government in making the concession cites both D and F, I believe. And in F, it says that, I mean, isn't there another reading of F that if OPTN transmits to the secretary these policies, this is what should be included? That it sort of isn't an order to do it? Yeah, so, Your Honor, I would say two things. One, that's not the interpretation HHS is advancing on appeal. They have conceded it. I think that's significant. But when you say they've conceded it, what do you mean by conceded it? Well, they say on page 7 that the OPTN is, quote, required to share with the secretary all proposed allocation policies and other related policies along with all supporting material for those policies, citing section 121.8, D, 1, and F. And I think there's good reason they're making the concession, which is these other subsections of 121.8 make clear that the initial allocation policies have to be provided to the secretary if the OPTN revises them and comes up with transition rules. Both the transition rules and the revised policies have to be submitted. And then it goes into great detail about what needs to be included in the transmittal to the secretary of proposed allocation policies. And so I think it would be a very peculiar reading to say that there's this little gap where if they revise the policy but don't come up with a transition rule, they're somehow exempt from this. And I think that's why HHS is not advancing that interpretation on appeal. And I do think that's significant because that was really the crux of the district court's reasoning below was, oh, no, no, these things don't have to be provided to the secretary. Therefore, the heightened procedures never kick in. And I don't see how HHS can defend that conclusion having now sort of agreed with us about what section 121.8 requires. So the position that you took or that was taken in the Callahan case, are you supporting that or have you abandoned that position? Yeah, no, we're not taking the argument, making the argument that was advanced in Callahan. That was an antecedent argument that all significant policies have to go through this procedure. And the court said, no, that's not right. It has to fit into one of these two categories. And so in this case, we're saying, okay, that's fine, but this new kidney allocation policy does fit into the second of those categories, which is for policies that the secretary directs the OPTM to provide him with. Your Honor, if I could turn briefly to our arbitrary and capricious challenge as well, so I can just cover that. Big picture point here is, Your Honor, the defendants started with their conclusion. They started with the premise. DSAs are illegal. DSAs have to be abandoned. We can't use DSAs. And it's very clear from the documentary materials of the regulatory process. From day one, that was a premise and a parameter of this policymaking endeavor. But that was wrong, or at least it turned out to be wrong, because under the final rule, geographic considerations can be used, if they're necessary, to advance the other goals of the rule, including efficiency, avoiding waste, and so on. And indeed, even the new policy considers geography. It's just a different geographic unit. So ultimately, the question is, what works? What works to advance these other objectives? The problem is defendants ruled out DSAs and the status quo before any alternative was even proposed, let alone modeled and analyzed. And that is arbitrary and capricious, because you can't start with your conclusion and then close your eyes to what the data is telling you about whether the premise is correct. And that really did infect the whole process from the beginning to end, because the defendants were under the impression that they didn't have discretion to keep the status quo. I would specifically direct the court to page 364 of the appendix, which is just a sample declaration from a member of the kidney committee, saying, yeah, I voted for this. I thought I had no choice. I was told DSAs are illegal. And that's just not correct. And when the agency acts based on an artificially constrained understanding of their discretion, that is grounds for vacature under the APA. Now, when you say they started with their conclusion, I thought that argument was addressed to we need to do something other than the DSAs. Now you're saying they started with the conclusion that geography was irrelevant? No, Your Honor. That's very, very different. No, Your Honor is correct. They started with the conclusion that DSAs are no good. DSAs are illegal. The final rule does not run away from that conclusion. That's correct, Your Honor. They've stuck with that. The problem is they made that determination before they saw the data that show that DSAs have advantages in terms of efficiency and ways. Now, that doesn't mean they have to stick with them, but it certainly means they're not foreclosed from sticking with the status quo. And our point is because they ruled that out from the outset, the status quo is not on the table. That tainted the entire course of the policymaking process because they artificially constrained the scope of what they were looking at and the options they were considering. And, again, when you actually look at the data, there's no question. The transplant numbers are going down. Deaths on the waiting list are going up. Post-transplant graft failure rate is going up. Transplant rate is going down. There are grounds here on which the defendant certainly could have decided, no, we want to stick with the status quo or maybe tweak the status quo in some way. All of that was ruled out artificially before they actually went through the process. That's why it was arbitrary and capricious. Your Honor, I don't think the clock had recorded my rebuttal time, and so with the court's permission, I'd like to reserve the remainder. Certainly. Thank you. Who is up next?  Mr. Henshawood. Good morning, Your Honors. May it please the court. Brad Henshawood for the government. Everyone see me? Thank you. I'd like to start just briefly where the court started, which is with this question of delay. This policy was adopted in December of 2019. That's several months before the onset of the coronavirus pandemic in the United States, and it's a full year before plaintiffs brought their critical comment to the Secretary or brought their suit in this case. All the complaints plaintiffs have raised in this appeal could have been brought before the Secretary the day the policy was adopted in December 2019. Plaintiffs now on appeal say, well, the reason we delayed is we were busy with the pandemic. Now, whatever you might think of that argument, it's not the one they advanced to the district court. The one they advanced in district court was that the suit wouldn't have been right or that they were engaged in sort of informal lobbying. So for them to now say, again, without having given that explanation, when the district court specifically prompted them to explain their delay after they initially brought their suit in December, for them to now turn out on appeal and try and rely on that is, I think, is pretty striking. So we think that basis alone, plaintiff's delay is sufficient reason to affirm the district court's decision here. That alone would be sufficient to show, particularly in light of the fact that circumstances on the ground have changed. Plaintiffs simply are asking you to ignore the fact that things are different now than they were in March or in December or at any point in that prior year when they could have filed their critical comment. So we don't think it's appropriate for the court to simply disregard the effects this would have on people nationwide to enjoin the policy at this time. Now, I'd like to turn briefly to this supposed concession that my colleague keeps referring to. What HHS has said in this case and the way these regulations are designed and the way the Natural Organ Transplant Act is designed is to have the OPTN as a body of transplant professionals, hospitals, doctors, as well as patients in the transplant community, set these policies. That's what Congress set out in the National Organ Transplant Act and to do so through a very robust system of public notice and comment. So in this instance, two 60-day periods of public comment spread out over 18 months in addition to statistical modeling and all manner of other consideration, including comments from the plaintiff hospitals here. So that is the baseline procedure, as the 11th Circuit called it in Callahan, that sort of process before the OPTN of public notice and comment. When you call it public notice and comment here, you're talking about the critical comments that are called for? No, you're not. I'm talking about the process the OPTN runs. So any person can submit comments in that process, and there were two 60-day periods of public comment in the course of developing the fixed-circle policy, and the plaintiff hospitals here submitted comments during that process. So that baseline process is what the 11th Circuit called it in Callahan, is the process for developing OPTN policies, including allocation policies. The secretary is not supposed to micromanage or dictate from the federal government the particular details of allocation policies. He's instead there to serve an oversight role  as the plaintiff stood here, in order for him to assess their complaints and to address them. And there's also the option, he has discretion, to reach out and direct that policies be referred to him for special additional procedures. Now, those procedures are there primarily to address circumstances when policies need to be made enforceable. Remember, OPTN policies are voluntary. There's no sanction for noncompliance with an OPTN policy. The enforceability inquiry, which is primarily what B2 is directed to, is there because the reason you would need a third round of notice and comment in the federal register would be if the secretary needed to or wanted to make a particular policy enforceable. The APA would require that. And so there's no need in the ordinary course for that sort of extra layer of procedures because voluntary compliance has generally been excellent, as the 11th Circuit again pointed out in Callahan. And so that discretion, which is again... Counsel, can I just ask a question about the difference between the two rounds of comment seeking that you describe having happened here and sort of the more formal notice and comment required going through the federal register? What is a practical matter is the difference between the two? I don't think there's a huge practical difference. I mean, you can... The OPTN notice and comment process, they publish, you know, for example, a briefing paper or a concept paper where there's been a 60-day period of comment. Members of the public can submit comments. It's administered through the OPTN rather than through the federal register. But in terms of who can submit comments and the detail and sophistication of those comments, I don't think there's any substantial difference. So that's why, Your Honor, when you look at the B2 process, it's there for sort of a special, unique set of circumstances. And that's why it hasn't been previously invoked. The secretary has made clear voluntary compliance with these policies has been excellent. He hasn't needed to reach out and make things enforceable. The OPTN has never recommended that a policy be made enforceable. And so there just hasn't been a need to invoke these procedures. And I also think it's worth focusing on the fact that the way plaintiffs now read B2 is frankly sort of bizarre. So they now concede, having lost in Callahan, that B2 is only triggered in one of two circumstances, either when the OPTN recommends that an allocation policy be made enforceable or when the secretary directs that a policy be referred to him under B2 for those procedures. So now they say, OK, we actually... We admit those are two separate routes, and we just read them to collapse on each other. The way they read B2 is to say we refer... The OPTN must refer all allocation policies to the secretary that it recommends to be enforceable and also all allocation policies. That's how they now read B2. And they do that based on a provision in an entirely different section of the regulations, 121.8F. And 121.8F in no way references B2, doesn't reference B at all, doesn't use the word direct, doesn't have any textual indication that it's an exercise of the secretary's authority under B2 at all. And it would be a very strange way to write a regulation, right? First of all, B2 itself is telling you the circumstances in which it applies and laying out those two different routes. If you were going to subject an entire class of policies to the extra procedures in B2, you would say that in B2. You wouldn't do it silently without ever referencing B2 in some other section of the regulations altogether. And you certainly wouldn't do it without making some mention of it somewhere in the preambles to the rule. And you certainly wouldn't do it if you were amending, as the secretary did, B2, 121.4B2, at the same time that you added 121.8F to the regulations. It's a very bizarre way to go about making the kind of judgment that plaintiffs are suggesting and injecting the secretary into a process that he's not, by design, meant to be in, right? This process is supposed to be carried out by the transplant community through the OPTN. I think it's also worth emphasizing, on plaintiff's theory, this would apply to every single change, no matter how minor, in an allocation policy. And the secretary, as the 11th Circuit pointed out in Callahan, part of what these regulations are designed to do is ensure that these policies can be adjusted relatively quickly, if needed. That simply wouldn't be possible under plaintiff's reading. You would have all of this extra procedure being injected every time. And that's, again, further evidence, as the 11th Circuit recognized, that this is never the way these regulations were intended to work. No one's ever read them to function this way until the suit. And plaintiffs themselves in Callahan didn't read the regulations to function this way. And so, you know, the consistent practice of the agency under the regulation is itself strong evidence that this is how these regulations function. Finally, Your Honor, just briefly to touch on the substantive claim from plaintiffs. Plaintiffs say the agency erroneously started from its conclusion. Plaintiffs in district court challenged the 2018 decision about DSAs. They've abandoned that challenge on appeal. In their brief, they acknowledge that the secretary, based on the evidence in front of him in 2018, may have been correct. They say may. He clearly was correct to conclude that DSAs could not be justified on that record in 2018. So plaintiffs now have to pivot. So this notion that the secretary started from the wrong place simply isn't supported by their own brief, and they've abandoned the arguments they made in district court on that score here. So plaintiffs now have to pivot, and what they say is, well, he didn't consider whether to retain the DSA-based policy. Well, that's because, as we've explained in detail, what the modeling actually showed is that these two policies were indistinguishable on the metrics plaintiffs are identifying, and that, in fact, the fixed circle policy would perform far better on metrics of equity than the DSA-based policy. And so that sort of judgment simply wasn't there to be made, and this idea that they didn't consider how this compared to the DSA-based policy, I mean, all of the modeling was run with a comparison to the DSA-based policy. The whole reason plaintiffs are able to make the arguments they're making is that the modeling continued to try to compare, you know, what are these new policies, these new proposals going to look like as compared to the old policy? So, you know, there's simply no basis for this claim that somehow these fewer transplants are going to occur or, you know, there'll be more deaths, and plaintiffs challenged the details of the modeling. I'm happy to discuss in detail why those challenges are incorrect, but it suffices to say, I think, for these purposes, that the secretary reasonably concluded that plaintiffs' objections to the models were wrong, and that there's a reasonable basis for that conclusion. And in that space where you're talking about agency judgments about how to model very complex policy changes in a very complex and medically difficult area, those kinds of choices where the secretary has articulated a reasonable basis, that's all that's necessary to survive the kind of APA challenge that plaintiffs are advancing here. And if there are no further questions, for me, Your Honors, I would let my colleague, Ms. Colberley. Thank you. Ms. Colberley. May it please the Court. Setting aside the merits, the district court found that the balance of the equities here weighed solidly against a preliminary injunction, and the question here is whether that was an abuse of discretion. It wasn't. For a full year, UNOS and the transplant community that it represents have been preparing to replace a policy that causes dramatic geographic inequities. Even based on the historical data, the new policy is projected to reduce those inequities dramatically without any increase in the mortality rate and without any significant decrease in the number of transplants. Now, you've heard some comments today about the delay. The fact is that these plaintiffs could have started this process at any time after the policy was adopted, that by filing their critical comments, they could have done so before the pandemic, and they could have filed their lawsuit whenever HHS issued its response and therefore provided them with a final agency action. In fact, they could have sued in 2018 over the decision by the secretary that DSAs were unlawful, and they did file that lawsuit in Callahan and lost. And the delay did cause prejudice. If the plaintiffs had filed their critical comment properly, HHS would have been able to address it without disrupting a policy change that the whole industry and whole transplant community has been preparing for. But the delay, which relates both to irreparable injury and to the balance of the equities, the delay isn't the only problem for the balance of the equities. Plaintiffs moved to enjoin this change to a more equitable system because they think they will do better financially if the inequitable system remains in place. They've said it's really about the patients, but they didn't present any evidence about them. And anyway, the plaintiffs' patients represent only about 4% of the total number of human beings on the kidney waiting list. UNOS, which serves as the OPTN, is designed to represent the entire transplant community, doctors, families, hospitals, and the 90,000 people who are waiting for a kidney today. And this is all just as Congress intended. There are a finite number of organs available for donation. Changes in allocation policy often require one person to wait a little bit longer somewhere in the country so that another person doesn't have to wait as long. These are really hard questions, and they require lots of expertise in the area and science and data. And that's why Congress created the OPTN and made it broadly representative, representing voices from all across the community, including doctors and families and patients on the waiting list. The plaintiffs here actually participated in the policymaking process. They submitted comments in the two rounds of public comment. In fact, in the second round of public comment, they submitted extensive comments raising these very same concerns. They were simply outvoted. They now say there should have been a third round of public comment, there should have been more modeling, taking into account different factors. We think they're wrong about all of those things. But regardless of what they're saying about the process, they can't show that the balance of the equities requires putting their financial interests ahead of the interests of the rest of the wait list and the rest of the transplant community while this lawsuit is pending. We would ask, Your Honors, that this court affirm the denial of the preliminary injunction. Thank you, counsel. Mr. Ross for Rapono. Thank you, Your Honors. I'll try to squeeze in a few points about the procedural issue and the substantive issue. First, on the procedural issue, I heard counsel say, well, there was a public notice and comment process here. Yes, but section 121.4b2 imposes an additional requirement of an independent advisory committee that was created precisely so that the secretary would have the benefit of independent expertise that was not coming from UNOS. And that process was skipped. I heard counsel say, well, this is principally about enforceable policies. Well, that's the first two sentences of the provision, but that ignores the third sentence, which creates the second category of policies that are subject to the heightened review. And contrary to what counsel said, it makes perfect sense that there would be an additional category. Yes, if OPTN recommends enforceability, that deserves heightened review. But if the policy is important enough that the secretary has required the OPTN to give him the proposal in advance, that is also significant enough to trigger these additional review procedures. And it's not true that this would cover minor changes because this provision is limited to significant proposed policies. So that answers the concern of, oh, any little thing is going to trigger this. No, it has to be significant. There is no dispute that the new kidney policy is significant. So our position makes perfect sense. And the idea that this whole thing was created as a mirage and is never used, I think, is just not credible. On the arbitrary and capricious point, counsel said it's indistinguishable. The two policies are indistinguishable on the metrics. Well, the court can look for itself. It's pages 161 and 163 of the appendix are the charts. Defendants own charts that show the projections relative to baseline. And the defendants have said that what's important about these projections is the direction, directionality. That's at 196 of the appendix. And the directions are going exactly the wrong way on a number of critical metrics. And that's even accepting their model after they removed geographic distance from the equation, despite nobody disputing that it's a critical factor in projecting whether an organ transplant is going to occur or not. You've got to look at the distance. They took it out, and they have no explanation for why they took it out entirely, even though the data contractor offered them a model that would have considered distance, would have addressed the issues with the first model, but would have considered distance in the equation. They said they don't even want to see it because it was going to show too steep a decline in transplants. That is arbitrary and capricious, your honors. Very good, counsel. Complicated case. It's been briefed and very well argued, and we will take it under advisement.